ALMON, Justice.
Alabama Power Company (Alabama Power) and Asplundh Tree Expert Company (Asplundh), defendants below, appeal from a judgment on a jury verdict granting Sam and Annette Ragland (the Raglands), plaintiffs below, $50,000 damages in trespass.[1] Alabama Power and Asplundh con *364 tend that the trial court erred in its application of the law on Alabama Power’s “right and authority to remove outside of [its] right-of-way such timber as may injure or endanger by shading, falling or otherwise any of its works. . .Code 1975, § 10-4-320(9) (See also § 37-4-130). This code section is the source of easements which Alabama Power has acquired since the early twentieth century to cut “danger trees” from the land such as that now owned by the Raglands.
This case has been to this Court once before. Ragland v. Alabama Power Company, 366 So.2d 1097 (Ala.1978). On that appeal this Court reversed a summary judgment for Alabama Power because the Court found there to be genuine issues of material fact which made summary judgment inappropriate. At the trial after remand, the trial court gave instructions to the jury which relied heavily upon the phrase “concrete threat of injury” as quoted in the prior opinion of this Court from Collins v. Alabama Power Company, 214 Ala. 643, 108 So. 868 (1926). We hold that the instructions as given placed too great a burden of proof on Alabama Power, that the full trial of the case dispelled the factual issue found in the prior appeal, and that the trial court should therefore be reversed.
The Raglands acquired a two-acre plot near Bessemer in 1968 and built a house on it in 1971. This land adjoined land on which Alabama Power had a right-of-way and on which it ran three high-voltage transmission lines, the closest of which was only a few feet from the Raglands’ property. When building his house, Mr. Ragland left standing some pine trees that blocked the view of the power lines from his house.
In November, 1975, Mr. Ragland received a letter from Alabama Power giving him notice that the company would be cutting trees along its right-of-way. Sometime later, Kenneth A. Berry (Berry), a supervisor of line clearing for Alabama Power, came to the Raglands’ house to show Mr. Ragland which trees they would be cutting. Mr. Ragland threatened to shoot anyone who came on the property to cut trees. After this “a deputy sheriff came out and delivered a paper stating that they did have that right, or it was on the deed that they had the right to cut the trees.” Mr. Ragland called an attorney, who told him to have Berry call him (the attorney) before cutting the trees. Nevertheless, when Berry came with employees of Asplundh to the property on December 19, he refused to call Mr. Ragland’s attorney and proceeded to cut down fifteen trees and top two others. An off-duty deputy sheriff accompanied them; Mr. Ragland took photographs of the operation.
After the trees were cut, Mr. Ragland hired Edward H. Givhan (Givhan), an experienced forester, who inspected the stumps and other conditions about the Raglands’ property in October of 1976. It was his affidavit which was the source of the factual dispute relied upon in our opinion, and he testified at trial to the same effect about topography, weather conditions, and health of the trees and his opinion that these trees did not pose a concrete threat of injury to the transmission lines.
Givhan’s testimony on cross-examination, however, points out a significant inconsistency. He testified that part of his business was to make appraisals of property for Alabama Power and the Tennessee Valley Authority (TVA) for acquisition of rights-of-way and condemnations:
A ... We make an evaluation of the property and the timber and then also make an evaluation of trees that are classed as danger trees.. . .

. .. And the forester makes a judgment of any trees that would fall and strike the power line or come within a certain distance. I believe for the Alabama Power Company it is within five feet.

. .. Then you make an evaluation of the land based on comparable land sales, and the same way with the timber.

Q And what else do you do?
*365 A Make an evaluation of the trees that are classed as danger trees.
Q Outside the right-of-way?
A Yes, sir. It would be almost, depending on the type of the trees and the height of the topography, whether the tree would fall and hit the conductor.
This testimony indicates a double standard for danger trees: when working for Alabama Power, Givhan considered height almost exclusively; when working for the Raglands, he also considered health of the trees, neighboring trees, and weather conditions. Furthermore, this testimony indicates that the price paid for the danger tree easement, which was reflected in the record title to the property bought by the Rag-lands, took into consideration Alabama Power’s long-standing five-foot rule.
Other parts of Givhan’s testimony undercut his conclusion that these trees posed no concrete threat of injury. Whereas his affidavit indicated that these trees would withstand 80-mile-per-hour winds, he testified that tornado winds reach up to 300 miles per hour, that tornados come through the area, and that the trees would be no match for such winds. He also testified that trees in the area are threatened by cronartium, or red orange rust, and by pine beetles. In fact, Mr. Ragland cut down four pine trees on the property in 1979 which were infested with pine beetles.
Statistics presented by Alabama Power graphically show that the ad hoc determination espoused by the Raglands and made by Givhan would have disastrous effects on electric service reliability and costs in Alabama. For distribution lines, those which run along the streets and serve only a small number of customers, Alabama Power clears only dead or leaning trees; for larger scale transmission lines, such as those involved here, Alabama Power cuts any tree that would fall within five feet of the nearest conductor.[2] (The federal courts, in Tennessee, at least, apply this same five-foot rule for TVA “danger tree” easements.) United States v. An Easement and Right of Way, 182 F.Supp. 899 (M.D. Tenn. 1960). Witnesses for Alabama Power testified that their records showed 1807 tree-caused outages on 5000 miles of distribution lines in 1975 and 5 tree-caused outages on 500 miles of transmission lines. For a fifteen-year period 95-96% of tree-caused transmission line outages were caused by live trees, 4-5% by dead or diseased trees. It is clear, therefore, that if Alabama Power has to make a tree-by-tree determination of “concrete threat of injury” based on the health of the tree and other arguable factors, the efficiency of tree-clearing operations will be substantially reduced and outages will probably increase. Alabama Power will also be subject to suit from any disgruntled property owner who does not agree that his trees pose a threat to neighboring lines. On the other hand, if we allow Alabama Power to continue using its five-foot rule, property owners will have a definite standard by which to trim their trees.[3]
The problems in this case stem from our reversal of the trial court’s earlier summary judgment in favor of Alabama Power. Our quotation from Collins v. Alabama Power Company, 214 Ala. 643, 108 So. 868 (1926), caused the trial judge to give the jury only one definition of “danger trees”: “trees which by reason of size or condition and contiguity to the Alabama Power Company right-of-way involved a concrete threat of injury to the Alabama Power Company transmission lines.” In effect, the instructions given the jury and its verdict in response changed this to size and condition.
This Court’s earlier opinion made it clear that we reversed based on the burden placed on the party moving for summary *366 judgment. Ragland v. Alabama Power Company, 366 So.2d 1097, at 1099. We now hold that the factual development at trial proved that the ascertainable standard which Alabama Power has developed is the only practicable method for determining what is a “danger tree.” The conflicting evidence offered by the Raglands’ and Alabama Power’s forestry experts only proves that the probability of a particular tree falling in a particular direction is not scientifically ascertainable, and so can provide no guidance to Alabama Power in exercising its duty to maintain its lines in a safe condition. Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975); Blackwell v. Alabama Power, 275 Ala. 123, 152 So.2d 670 (1963); Alabama Power Company v. Matthews, 226 Ala. 614, 147 So. 889 (1933).
Decisions of this Court subsequent to Collins have discussed “danger trees” without relying specifically on the phrasing used in Collins. See e.g., Thompson v. Alabama Power Company, 336 So.2d 1102 (Ala. 1976); Alabama Power Company v. Henson, 237 Ala. 561, 187 So. 718 (1939). The opinion in Thompson made specific reference to the code sections cited at the beginning of this opinion and referred to “danger trees” as “fall line trees”; in Henson, the phrase used was “trees as they grow high enough to endanger the line.” In reliance upon our prior opinion in this case, however, the trial court refused to give a requested instruction based on the statutory definition and two instructions that the verdict should be for the defendants if the jury was reasonably satisfied from the evidence that trees within falling distance of transmission lines pose a concrete threat of injury to them.
It is evident, therefore, that the jury was led to believe that Alabama Power Company was required to prove more than its size and contiguity measurements. We cannot fault the trial court for attempting to conform to our prior opinion. However, the evidence showed conclusively that all of the trees cut were “danger trees” as a matter of law. Therefore, the case is due to be reversed and rendered and a judgment is entered here in favor of Alabama Power.
REVERSED AND RENDERED.
TORBERT, C. J., and MADDOX, FAULKNER, SHORES, EMBRY, BEAT-TY and ADAMS, JJ., concur.
JONES, J., concurs specially.

. The Raglands’ cross-appeal is rendered moot in view of our decision in the Alabama Power appeal.

. Alabama Power sought to introduce contracts with tree-cutting companies using this guideline which went back to 1948. The trial court excluded the exhibits because they were offered to prove adverse possession and, although the same right-of-way was covered in the contracts, there was no evidence that trees on the Raglands’ lot had actually been cut.

. Alabama Power does not top trees except ornamental trees close to houses; the two trees topped in this case were the farthest from the lines. Nevertheless, a property owner could presumably retain his trees by trimming them himself.